`IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL DOCKET NO.: 5:06CV125-V

| | |
|---|---|
| REBECCA S. SMITH, individually, and on behalf of a class of those similarly situated, )<br>)<br>Plaintiffs, )<br>)<br>vs. )<br>)<br>GMAC MORTGAGE CORPORATION, )<br>)<br>Defendant. )<br>_____ ) | MEMORANDUM AND ORDER |

**THIS MATTER** comes before the Court on the following motions and memoranda: Defendant's Motion To Dismiss, and Defendant's Brief in Support of Motion to Dismiss, both filed October 19, 2006 (Documents #5, #6); Plaintiffs' Brief in Opposition to Defendant's Motion to Dismiss, filed October 26, 2006 (Document #7); and Defendant's Reply, filed November 6, 2006 (Document #8). This matter is now ripe for disposition by the Court. Having carefully considered the arguments of the parties, the record, and the applicable authority, this Court will deny Defendant's Motion to Dismiss.

## I. PROCEDURAL HISTORY

On August 10, 2006, Plaintiff Rebecca S. Smith, individually and on behalf of those similarly situated, filed a complaint in the Superior Court of Catawba County, North Carolina, against GMAC Mortgage Corporation ("GMAC").[1] On September 22, 2006, Defendant GMAC filed a Notice of Removal from the Superior Court of Catawba County

---

[1] Plaintiff Smith only seeks declaratory and injunctive relief on behalf of the putative class. (Compl., ¶¶98, 104(f), 110) The remaining causes of action are asserted by her individually. Rule 23 is not implicated by the instant motion.

to the United States District Court for the Western District of North Carolina, Statesville Division (Document #1). On October 19, 2006, GMAC filed a Motion to Dismiss Count Three of Plaintiffs' Complaint, alleging Breach of Fiduciary Duty, pursuant to Fed. R. Civ. P. 12(b)(6) (Document #5).[2]

## II. FACTS

With respect to Defendant's Motion to Dismiss, the Court accepts the following facts stated in Plaintiffs' Complaint as true. See Darcangelo v. Verizon Commc'ns, Inc., 292 F.3d 181, 189 (4th Cir. 2002) (remarking that "at the motion to dismiss stage, the court must accept the allegations of the complaint as true and view the complaint in the light most favorable to the plaintiff").

In January 1997, Plaintiff Rebecca S. Smith ("Smith") purchased a home located at 3332 47th Avenue Place NE, Hickory, North Carolina, 28601, from Teresa Snow. (Compl. ¶8) In purchasing the home, Smith executed various contractual documents including a Deed of Trust dated January 13, 1997 for the benefit of the original mortgagee, First Citizens Bank ("First Citizens").[3] (Id. ¶¶9, 13) Smith obtained a homeowner's policy ("Policy") from Nationwide Insurance on January 12, 1997, immediately prior to execution of the Deed of Trust. (Id. ¶12)

---

[2] By Order dated May 21, 2007 (Document #14), the Court ordered Plaintiff to submit a copy of the Deed of Trust and other documents collectively as Document #15.

[3] The Deed of Trust which created the mutual obligations between the parties is, of course, a three-party instrument designed to secure a loan. Plaintiff is its grantor, an individual is named as trustee, and Defendant's predecessor (First Citizens) is *cestui que* trust. For convenience, Plaintiff is referred to as mortgagor and Defendant as mortgagee.

The Deed of Trust expressly provided that the borrower (Smith) would pay to the lender monthly amounts meant to be applied, inter alia, toward property taxes and property insurance premiums. (Id. ¶10 / Deed ¶2) These monthly payments were held in escrow and applied to pay the taxes and insurance premiums as escrow items. (Compl. ¶¶15, 16) The Deed of Trust imposed the duty of paying these escrow items upon the lender. (Id. ¶¶10, 16) The Deed of Trust required hazard and property insurance and provided that: "If Borrower fails to maintain coverage, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property . . . ." (Id. ¶11 / Deed ¶5) Insurance obtained by the lender under these circumstances is referred to by the parties as "force-placed insurance." (Compl. ¶11)

On August 4, 2000, First Citizens notified Smith that the mortgage would be transferred to GMAC. (Id. ¶25) First Citizens also informed Smith that GMAC would "receive and process your payments, manage your escrow account for insurance and tax payment (if you pay sums into escrow), and respond to your inquiries." (Id.) Subsequently, GMAC sent Smith a letter dated September 8, 2000 which stated, "your homeowners/hazard insurance will not be affected by this transfer. A notification is being sent to your hazard insurance carrier to send future insurance information to GMAC Mortgage." (Id. ¶26)

On or about September 2000, First Citizens transferred the mortgage to GMAC. (Id. ¶13) Like First Citizens, GMAC established an escrow account and required Smith to make payments to fund the account. (Id. ¶15) Between September 2000, and on or about December 2002, GMAC made payments to Nationwide for the homeowner's insurance premiums under the Policy. (Id. ¶¶13, 16, 28) The Policy was "mortgagee

billed." (Id. ¶23)   In other words, Nationwide sent bills for the insurance premiums to GMAC, not Smith.  (Id.)  Nationwide periodically sent notices to Smith stating that the Policy premiums were billed to the mortgagee, GMAC.  (Id. ¶24)

On or about December 6, 2002, Nationwide informed GMAC that the Policy would be cancelled on January 13, 2003 unless the premium was paid.  (Id. ¶28) Sometime prior to January 2003, Nationwide also sent a bill to GMAC for a premium payment that was due on or about January 16, 2003 under the Policy.  (Id. ¶27) Shortly thereafter, Nationwide sent GMAC a warning notice extending the grace period until February 4, 2003.  (Id. ¶29) GMAC allegedly failed to make the premium payment out of escrow or respond to these notices.  (Id. ¶31) Nationwide cancelled the Policy retroactive to January 13, 2003.  (Id.)[4] In the letter notifying GMAC of the cancellation, Nationwide, through its Hickory agent, Jeff Kincaid, also stated that had the premium been paid by the mortgagee, Smith would not have been forced to meet the new eligibility underwriting guidelines, and her policy would have remained in effect.  (Id. ¶32)

On August 20, 2003, GMAC notified Smith via letter that it obtained a force-placed insurance policy[5] from Balboa Insurance Group ("Balboa"), the insurance company that

---

[4] The previous statements in this paragraph contain factual information from the complaint that is attributable to Nationwide.

[5] As already mentioned, GMAC's ability to independently obtain homeowner's insurance was expressly provided for in the Deed of Trust as a means of protecting its own interest in the real property. (Deed ¶5) Plaintiff contends that GMAC had "no lawful basis" to obtain force-placed insurance given the circumstances of this case, namely, that Plaintiff (the Borrower) did not fail to maintain coverage. (Id. ¶52) Plaintiff further alleges GMAC received a commission or other compensation when implementing the Balboa force-placed insurance policy on Smith. (Id. ¶64)

had only recently begun to service the escrow account on behalf of GMAC and Smith.[6] (Id. ¶¶49-50) The force-placed insurance GMAC imposed upon Smith resulted in a much higher premium. (Id. ¶46) The force-placed insurance had an annual premium of $1,182 - more than three times higher than the previous Policy premium of $370.99. (Id. ¶47) GMAC also charged Smith with interest on the money advanced for the force-placed insurance. (Id. ¶46) Smith was charged $1,182 on August 18, 2003 for her 2003 coverage and $1,164 in January 2004 for coverage in 2004.[7] (Id. ¶48)

Smith has received conflicting information from GMAC and Nationwide as to what caused the Policy to lapse.[8] (Compl. ¶33) A letter sent to Plaintiff's counsel on behalf of Nationwide and dated November 8, 2005, stated that the Policy was cancelled because the "bill was never paid by the mortgagee (GMAC)." (Id. ¶¶31, 33) GMAC contends the Policy lapse was the fault of Nationwide. (Id.) Although GMAC contends that it made timely premium payments out of escrow, upon Plaintiff's information and belief, GMAC never disputed or responded to the notices and warnings of cancellation it received from Nationwide. (Id. ¶44)

---

[6] Beginning March 2003, GMAC outsourced insurance processing functions to Balboa. (Compl. ¶42) During the relevant time period, GMAC used third-party vendors such as Balboa for purposes of its escrow administration including insurance and real estate tax tracking, bill procurement and processing. (Id. ¶40)

[7] On or about November 1, 2004, Smith obtained a second policy from Nationwide which had a premium less than the force-placed insurance, but still more than $200 higher than the premium under the old Policy. (Compl. ¶51)

[8] Although the instant motion does not invoke an inquiry into possible defenses to the claim in question, the Court notes that GMAC's disclosures, as represented in the Complaint, do not conclusively establish whether GMAC did in fact, pay Smith's premium. (Compl. ¶¶34-38, 43) Defendant has not presented the Court with a "cancelled check" or equivalently succinct record of electronic payment as evidence that it made the required payment.

According to Plaintiff, the increased amount of the force-placed insurance resulted in Smith experiencing difficulty paying the necessary amount due and consequently, she fell behind in her mortgage payments. (Id. ¶53) Shortly thereafter, GMAC instituted foreclosure proceedings in Catawba County against Smith. (Id. ¶¶54-55) When confronted with the facts as represented by Nationwide, GMAC refused to dismiss the foreclosure proceedings. (Id. ¶56) On April 28, 2006, the Clerk of the Court denied GMAC's petition to foreclose on the property. (Id. ¶57)

As a result of GMAC's alleged improper mortgage servicing practices, Smith's credit score has been damaged. (Id. ¶¶58-60) Furthermore, Smith alleges she has incurred fees, costs, and expenses related to her home mortgage and homeowner's insurance as a consequence of GMAC's alleged misconduct. (Id. ¶61) Upon Plaintiff's information and belief, GMAC also failed to pay county taxes on Smith's home in a timely manner. (Id. ¶63)

Smith alleges that in establishing the escrow account and obligating the consumer (Smith) to make payments into it, GMAC "obligated itself to certain duties of care and fiduciary duties in administering the account on the consumer's behalf." (Id. ¶19) Smith specifically alleges GMAC had a duty to forward in timely fashion funds paid by Smith into escrow for homeowner's insurance and property taxes. (Id. ¶¶20, 63, 81) Smith further challenges GMAC's practice of outsourcing these duties (i.e., the servicing of real estate tax bills and hazard insurance policy and payments) in order to save costs. Smith claims GMAC engaged in outsourcing without instituting proper oversight.[9] (Id. ¶41)

---

[9] Balboa's role as the outsourcing entity is also unclear. A GMAC representative wrote an e-mail dated March 15, 2005, stating, "our notes indicate a premium of $363 as having been paid by lender would have been *prior to Balboa servicing the file*." (Id. ¶39) (emphasis added). This e-mail does not give a date on which the payment was made. (Id.)

## III. DISCUSSION

Defendant now moves to dismiss Plaintiffs' claim against it for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Defendant's motion could be construed as a motion for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. FED. R. CIV. P. 12(b); *But see*, Williams v. Chase Manhattan Mortgage Corp., 2005 WL 2544585, *6 (W.D.N.C. October 11, 2005) (conversion to summary judgment motion is not always necessary where documents central to plaintiff's claim, or documents sufficiently referred to in the complaint, are considered). However, construing the motion as such would not alter the Court's analysis or aid the decisional process.

### A. Standard of Review

"The purpose of a Rule 12(b)(6) motion is to test the legal sufficiency of a complaint." Hall v. Virginia, 385 F.3d 421, 427 (4th Cir. 2004). "In reviewing the legal sufficiency of the complaint, [the] court must accept as true all well-pleaded allegations and must construe the factual allegations in the light most favorable to the plaintiff." Randall v. U.S., 30 F.3d 518, 522 (4th Cir. 1994). However, in considering a 12(b)(6) dismissal, the court is not bound to the legal conclusions alleged in the complaint. United Mine Workers of Am., Inc. v. Wellmore Coal Corp., 609 F.2d 1083, 1085 (4th Cir. 1979). Such factual allegations "must be stated in terms that are neither vague nor conclusory." Estate Const. Co. v. Miller & Smith Holding Co., Inc., 14 F.3d 213, 221 (4th Cir. 1994). A motion to dismiss for failure to state a claim upon which relief may be granted should be allowed if, after reviewing the well-pleaded allegations as true and in the light most favorable to the plaintiff, "it appears certain that the plaintiff can prove no set of facts which would support

his claim and entitle him to relief." Greenhouse v. MCG Capital Corp., 392 F.3d 650, 655 (4th Cir. 2004) (quoting Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993)).

### B. Pleading Standard

In federal court, plaintiffs are only obligated to give a short and plain statement of the claim. Fed. R. Civ. P. 8; Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168 (1993). Consequently, Plaintiff must simply provide sufficient facts to support her claim regarding the existence of a fiduciary relationship, not prove it. Id. Defendant attacks Plaintiff's complaint as conclusory and devoid of specific factual allegations regarding the existence of a fiduciary relationship, but its contentions in this regard are unavailing at this stage of the proceedings. (Compl. ¶¶5-64)

### C. Fiduciary Duty Under North Carolina Law[10]

"For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." Dalton v. Camp, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001). Although North Carolina courts have been reluctant to define conclusively the term "fiduciary relationship," the North Carolina Supreme Court broadly defines such a relationship as one "where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." Volumetrics Med. Imaging, Inc. v. ATL Ultrasound, Inc., 243 F.Supp.2d 386, 404 (M.D.N.C. 2002) (quoting Abbitt v. Gregory, 201 N.C. 577, 598,160 S.E. 896, 906 (1931)). Such confidential relationships "are not limited

---

[10] Paragraph 15 of the Deed of Trust explicitly states that "the Security Investment shall be governed by federal law and the law of the jurisdiction in which the Property is located." Accordingly, North Carolina law governs the instant case.

to a purely legal setting but may be found to exist in situations which are moral, social, domestic, or merely personal." Rhone-Poulenc Argo S.A. v. Monsato Co., 73 F.Supp.2d 540, 545 (M.D.N.C. 1999) (quoting Curl v. Key, 311 N.C. 259, 264, 316 S.E.2d 272, 275 (1984)). In general, North Carolina recognizes two types of fiduciary relationships: "(1) those that arise from 'legal relations such as attorney and client, broker and client, principal and agent, trustee and *cestui que* trust,' and (2) those that exist 'as a fact, in which there is confidence reposed on one side, and the resulting superiority and influence on the other.'" Rhone-Poulenc, 73 F.Supp.2d at 546 (quoting Abbitt, 201 N.C. at 598; See White v. Consolidated Planning, Inc., 166 N.C.App. 283, 293, 603 S.E.2d 147,155 (2004).

Specifically, North Carolina courts have described the following relationships as examples of a fiduciary relationship that arises as a matter of law: attorney-client, business partners / joint venturers, trustor-trustee, principal-agent, and mortgagor-mortgagee in transactions affecting mortgaged property. See Corneilus v. Helms, 120 N.C.App. 172, 175, 461S.E.2d 338, 340 (1995) (lawyer-client relationship is a fiduciary relationship as a matter of law); HAJMM Co. v. House of Raeford Farms, Inc., 328 N.C. 578, 588, 403 S.E.2d 483, 489 (1991) (business partners are each others' fiduciaries as a matter of law); Rhone-Poulenc, 73 F.Supp.2d at 545 (fiduciary relationship exists as a matter of law between joint venturers under North Carolina law); Carroll v. Rountree, 36 N.C.App. 156, 158, 243 S.E.2d 821 (1978) (remarking in dictum that trustor-trustee, principal-agent, and mortgagor-mortgagee are "known and definite" fiduciary relationships) (internal citations omitted).

North Carolina has identified those relationships which, as a matter of law, do not satisfy the criteria necessary for a fiduciary relationship. It is well established that "no

fiduciary relationship exists between mutually interdependent businesses with equal bargaining positions who dealt at arms-length." Rhone-Poulenc, 73 F.Supp.2d at 546. Accordingly, absent "special circumstances" resulting in one party having "superiority and influence" over the other, the following relationships are not considered fiduciary: president-manager and corporate directors, franchisor-franchisee, manufacturer-distributor, and corporate directors and corporate creditors. Id.; Volumetrics, 243 F.Supp.2d at 405 (relationship between franchisor-franchisee is not fiduciary); Lazenby v. Godwin, 40 N.C.App. 487, 493-494, 253 S.E.2d 489 (1979) (absent special circumstances, the relationship between president/manager and corporate directors is not fiduciary); Oberlin Capital, L.P. v. Slavin, 147 N.C.App. 52, 61, 554 S.E.2d 840 (2001) (absent special circumstances, the relationship between corporate directors and corporate creditors is not fiduciary); Tin Originals v. Colonial Tin Works, Inc., 98 N.C.App. 663, 665-666, 392 S.E.2d 831 (1990) (relationship between manufacturer and its exclusive distributor is not fiduciary).

"In less clearly defined situations, the question whether a fiduciary relationship exists is more open and depends ultimately on the circumstances. Courts have historically declined to offer a rigid definition of a fiduciary relationship in order to allow imposition of fiduciary duties where justified." HAJMM, 328 N.C. at 588; Hinton v. West, 207 N.C. 708, 178 S.E. 356, 360 (1935) ("Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be excluded.") (quoting Pomeroy's Equity Jurisprudence (3d Ed.), vol. 2, §956). Consequently, the determination of when a fiduciary relationship exists is dependent upon a variety of factors. Id.

The Rhone-Poulenc court identified several factors used to determine when a fiduciary duty exists including: "the degree of kinship between the parties, the disparity in age, health, mental condition and education and business experience between the parties; and the extent to which the "servient" party entrusted the handling of its business affairs to the "dominant" party and placed trust and confidence in it."  Rhone-Poulenc, 73 F.Supp.2d at 546.

Ultimately, the question of the existence or non-existence of a fiduciary relationship is "determined by the specific facts and circumstances of the case" and is "a question of *fact* for the jury."  Powell v. Omli, 110 N.C.App. 336, 347, 429 S.E.2d 774, 779 (1993) (emphasis in original); See also Bradson Mercantile, Inc. v. Vanderbilt Indus. Contracting Corp., 883 F.Supp 37, 56 (W.D.N.C. 1995); HAJMM, 328 N.C. at 587-592 (explaining the respective roles of expert witnesses and jurors in deciding whether or not a fiduciary relationship existed and whether or not breach occurred – both issues are to be decided by the jury although the expert may opine about the presence or absence of relevant factors); Rhone-Poulenc, 73 F.Supp.2d at 546 (citing Speck v. North Carolina Dairy Found., 64 N.C.App. 419, 423, 307 S.E.2d 785 (1983), rev'd on other grounds, 311 N.C. 679, 319 S.E.2d 139 (1984)).[11]

---

[11] The Rhone-Poulenc court considered the existence of a fiduciary relationship, and alleged breach thereof, in the context of an action seeking rescission of a contract based upon actual or constructive fraud.  The court noted that in order to determine whether a fiduciary relationship existed, factual questions regarding the nature of the parties' relationship, namely, whether the parties entered into a joint venture, had to be resolved before determining if a presumption of fraud applied.

### D. Analysis

The issue before the Court is whether Plaintiff's breach of fiduciary claim against Defendant is cognizable under North Carolina law. The existence of a fiduciary relationship between mortgagor and mortgagee is a question that neither the Supreme Court of North Carolina nor the Fourth Circuit has directly addressed and, consequently, is one of first impression for this court.[12]

Defendant first contends that Plaintiff failed to allege "anything more than a typical debtor-creditor contractual relationship." Indeed, it is well established that "parties to a contract do not thereby become each others' fiduciaries; they generally owe no special duty to one another beyond the terms of the contract and the duties set forth in the U.C.C." See Branch Banking & Trust v. Thompson, 107 N.C.App. 53, 418 S.E.2d 694 (1992) (finding commercial lender - borrower situation did not give rise to fiduciary duty but noting that under proper circumstances, a bank - customer relationship could create a fiduciary relationship); South Atlantic Ltd. P'ship of Tenn. L.P. v. Riese, 284 F.3d 518, 533 (4th Cir. 2002) ("North Carolina is reluctant to impose 'extra-contractual fiduciary obligations' in the context of general commercial contracts; thus, even when parties to an arms-length transaction have reposed confidence in each other, no fiduciary duty arises unless one party thoroughly dominates the other.") Thus, an important consideration facing the Court is whether there may be an extra-contractual fiduciary duty applied to the Defendant, or

---

[12] One could posit that North Carolina has already determined that the mortgagor - mortgagee relationship is fiduciary as a matter of law where transactions affecting the mortgaged property are concerned. See Hinton, 178 S.E. at 360; Carroll, 36 N.C.App. at 158. However, the Court's reading of the relevant cases leads the undersigned to the conclusion that cases following Hinton extrapolate from that case to a degree not warranted by its holding.

whether contract law is sufficient to protect Plaintiff against the types of losses alleged.

In support of its motion, Defendant asserts that Wells, Dalton, and Stern prohibit the Court from finding in favor of Plaintiff on this issue. The undersigned disagrees as each of these cases is distinguishable. In Wells v. N. Carolina Nat'l Bank, the North Carolina Court of Appeals considered the relationship generally between a lender and lendee. Wells v. N. Carolina Nat'l Bank, 44 N.C.App. 592, 261 S.E.2d 296 (1980). The plaintiff in Wells purchased real property via foreclosure proceedings under the mistaken belief that the lender was going to obtain fire insurance coverage on the commercial property. There was no contractual provision expressly designating the lender as the party responsible for securing insurance. Although there were some discussions between the lender, lendee, and the closing attorney regarding the need to obtain insurance, the court determined that there was no evidence, implied or express, that the lender was responsible for obtaining fire insurance on the property. The court further explained, "there is no indication that a fiduciary relationship or course of dealing existed between plaintiff and NCNB such that would create a duty on the part of NCNB to attend to details of plaintiff's purchase other than the financial services it offered." Wells, 44 N.C.App. at 596. While no relief was had by the lendee, the court's mention of a fiduciary relationship tends to show its recognition that a fiduciary relationship could exist under different facts.

In Dalton v. Camp, which involved an employer - employee relationship, the North Carolina Supreme Court emphasized that even when a relation of trust or confidence is present, a fiduciary relationship does not exist without facts tending to show "*resulting domination and influence.*" Dalton, 353 N.C. at 651 (emphasis in original). Thus, GMAC contends it had no "resulting domination and influence" over Smith. Finding Smith's breach

of fiduciary duty claim cognizable is consistent with the holding in Dalton. Applying North Carolina law, the Fourth Circuit explained that: "[w]hen one party figuratively holds all the cards – all the financial power or technical information, for example – the special circumstance of a fiduciary relationship has arisen." See Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 348 (4th Cir. 1998). Similarly, the Volumetrics court stated that a fiduciary duty may arise when one party has control of or directs another's activities or interests. Volumetrics, 243 F.Supp.2d at 407. Because GMAC was exclusively responsible for attending to the payment of insurance premiums (through a third-party servicing agency or otherwise), and because Plaintiff's homeowner's insurance was "mortgagee billed," a reasonable juror could determine that GMAC possessed sufficient control, direction, and influence over Plaintiff's interests.

Defendant next cites Stern v. Great Western Bank,[13] which addresses a claim of breach of fiduciary duty between lender and lendee following the lender's disclosure of lendee's financial records in response to a subpoena. Stern v. Great Western Bank, 959 F.Supp. 478, 487 (N.D.Ill. 1997). The Stern court held that "the conventional mortgagor-mortgagee relationship, standing alone, is insufficient to sustain an allegation of a fiduciary or special relationship." Id. However, the court acknowledged that a fiduciary relationship may arise between a lender-lendee / mortgagor-mortgagee "where one party, due to a close relationship, relies heavily on the judgment of another." Id. The mortgagor in Stern argued that certain confidential financial information the mortgagee possessed was a sufficient circumstance to establish a fiduciary relationship. Id at 486-487. The court found

---

[13] Defendant challenges Plaintiff's reliance on federal cases arising out of the State of Illinois interpreting Illinois law, yet similarly cites an Illinois case in this context.

the lender's access to lendee's financial documents entirely consistent with any mortgagor-mortgagee relationship in that the lender must evaluate the risks, if any, associated with issuance of the loan. Id. at 487. The court also agreed with the lender that the mortgagee was not in a dominant position for purposes of responding to the subpoena. Id. Because the mortgagor did not allege any facts tending to suggest that the relationship between mortgagor and mortgagee was anything other than a typical mortgagee-mortgagor relationship, the breach of fiduciary duty claim was dismissed. Id. Significantly, Stern did not involve the mortgagee's alleged mismanagement of an escrow account initiated under the terms of the mortgage.

Defendant GMAC finally contends that its contractual duty to make payments from escrow did not create a relationship of trust which established a fiduciary duty. While Defendant references several non-binding cases addressing fiduciary duty and the mortgagor-mortgagee relationship, none of Defendant's cited material provides convincing support as to why Plaintiffs' claim is not cognizable under North Carolina law.

North Carolina courts acknowledge that fiduciary obligations *may* (and quite possibly should) exist between mortgagor and mortgagee under certain facts. See Hinton v. West, 207 N.C. 708, 178 S.E. 356, 360 (1935); Carroll, 36 N.C.App. at 158 (citing Hinton for the proposition that fiduciary relationship may exist between mortgagor and mortgagee in transactions affecting the mortgaged property); McNeil v. McNeil, 25 S.E.2d 615, 617, 223 N.C. 178, 181 (1943) (same); Cross v. Beckwith, 16 N.C.App. 361, 363, 192 S.E.2d 64, 66 (1972) (same).[14] The Court agrees with Plaintiffs that under North Carolina law, there

---

[14] Although Illinois law does not govern, Illinois state courts apply the same test to evaluate the existence of a fiduciary relationship as North Carolina courts. See Rhone-Poulenc,

may be a cognizable claim of breach of fiduciary duty between mortgagor and mortgagee under such facts as are presented here.

The Court finds Hinton v. West instructive. In Hinton, plaintiff, an individual landowner ("Hinton") became acquainted with defendant, a local lawyer ("West"). Unrelated to any business dealings or attorney - client relationship, defendant apparently took an interest in the property owned by Hinton and bestowed various items of value upon Hinton. Defendant also loaned plaintiff $300, sold him a vehicle he owned for $475, and assisted plaintiff with the payment of taxes. In exchange, West took a note and mortgage on one-half acre of land. When the note became due and Hinton was unable to pay, West threatened foreclosure. Hinton, without the benefit of legal counsel, agreed to forego his equity of redemption.[15] A "strawman" purchase was facilitated by the mortgagee – Hinton made a deed conveying 42 acres of land to West's brother but West was deemed to be the actual primary party to the purchase.

---

73 F.Supp.2d at 545-46. The State of Illinois recognizes that "mismanagement of an escrow may give rise to a cause of action for a breach of fiduciary duty." Ploog v. Homeside Lending, Inc., 207 F.Supp.2d 863, 875 (N.D.Ill. 2002) (quoting Choi v. Chase Manhattan Mortgage Co., 63 F.Supp.2d 874, 885 (N.D.Ill. 1999)). The Ploog court went on to note that "mortgage contracts carry with them an implied duty of professional competence 'analogous to the way the duty of good faith and fair dealing is imputed as a term of the contract.'" Id. Defendant posits that Illinois imposes a "heightened duty" on mortgage lenders, thereby precluding this Court from treating authority from Illinois as persuasive. However, the Ploog case cited by Defendant in support of this proposition merely answers the exact issue posed here in favor of the mortgagor - a result GMAC disagrees with. Thus, Illinois cases may serve as an appropriate reference to assess the obligation, if any, of a fiduciary in the context of the mortgagor-mortgagee relationship.

[15] GMAC concedes a fiduciary relationship exists in the equity of redemption context. See McLeod v. Bullard, 84 N.C. 515 (1881) ("Where a mortgagee buys the equity of redemption of his mortgagor, the law presumes fraud and the burden of proof is upon the mortgagee to show the bona fides of the transaction."); Harrelson v. Cox, 207 N.C. 651, 178 S.E. 361, 361 (1935).

In reversing the lower court's judgment of nonsuit in favor of the mortgagee, the North Carolina Supreme Court noted that a treatise on fraud identified the relationship between mortgagor and mortgagee as one of eight enumerated "relations of confidence," which give rise to a presumption of fraud because of the "undue advantage which the situation itself gives to one over the other." Hinton, 178 S.E.2d at 360. The same treatise was attributed as placing the relation of mortgagor and mortgagee with the other "well defined and universally acknowledged fiduciary relations." Id. (internal citations omitted). The state court cited the treatise's characterization of the mortgagor - mortgagee relationship with approval:

> "Upon principle, this should be so. It is due to good faith and common honesty that such a presumption should arise in every case where confidence is reposed, and the property and interests of one person are committed to another. To every such person his trust should be a sacred charge - not to be regarded with a covetous eye."

Id. at 361.[16]

The purchase of a personal residence is often the largest and most significant transaction that a given individual undertakes. In the vast majority of cases, the buyer places a Deed of Trust on the home to secure payment of a promissory note representing the balance of the purchase price. Such a Deed of Trust virtually always requires maintenance of ad valorem taxes and homeowners' insurance to guard against loss by tax foreclosure and loss by fire or other casualty, which aside from non-payment of the note,

---

[16] The court's use of the terms "good faith" and "common honesty" is consistent with the language used by the Northern District of Illinois to describe the "implied duty of professional competence" associated with a mortgage contract. See Ploog, 207 F.Supp.2d at 875.

are the two most significant risks to the residence. The risks are of such overweening importance both to mortgagor and mortgagee that typically the Deed of Trust requires institution of an escrow account to be managed by mortgagee which, as in the instant case, further protects itself by retaining the right to make the necessary payments upon default by mortgagor and to charge those sums back to mortgagor with interest.

The facts of the instant case aptly illustrate the steep consequences attendant to non-payment of taxes and insurance to the homeowner and the rationale for the mortgagee to allocate to itself the duty of faithful payment of property taxes and insurance premiums. The mortgagor places trust and confidence in the mortgagee's assumption of this responsibility and justifies a finding that Count Three of the complaint remains viable. This almost universal practice reflects the significant bargaining power of mortgagees over that of mortgagors.[17] The level of confidence that a mortgagor (servient party) instills in the mortgagee is significant under these circumstances. When there is a cognizable level of confidence between two parties, both are "bound to act in good faith and with due regard to the interests of the one reposing confidence." Abbitt, 201 N.C. at 598 (fiduciary relationship found between plaintiff and defendant with respect to the plaintiff's sale of his stock to the defendant).

According to Plaintiff, in signing the Deed, Plaintiff placed her trust and confidence in Defendant to receive and process her payments in escrow in a timely fashion and subsequently, make the appropriate insurance payments to Nationwide as agreed. (Compl. ¶¶9-10) Defendant was also in the unique position of controlling when and how

---

[17] According to Plaintiff, GMAC requires customers to pay into escrow accounts for approximately 77% of its servicing portfolio. (Compl. ¶17)

the funds Plaintiff provided would be disbursed because the invoices Nationwide billed were sent directly to GMAC, not Smith. (Id. ¶¶10, 13, 23, 25 / Deed, ¶2)

Plaintiffs allege that, at minimum, Defendant had a contractual obligation to make the required payments in escrow to Plaintiff's insurer, Nationwide. (Compl. ¶¶ 9-10, 18) As plead by Plaintiff, Defendant's failure to provide timely payments resulted in the lapse of Plaintiff's homeowner's insurance and consequently, Plaintiff was required to purchase the higher priced force-placed home insurance which ultimately led to the foreclosure on Plaintiff's home. (Compl. ¶33, 45-46, 54-56) A reasonable jury could find that the circumstances surrounding the mortgager-mortgagee relationship between Plaintiff and Defendant created a fiduciary duty through the obligations of trust, confidence and good faith. See Rhone-Poulenc, 73 F.Supp.2d at 546; Volumetrics, 243 F.Supp.2d at 404. In failing to make timely payments out of Plaintiff's escrow account to Nationwide, Defendant arguably breached these extra-contractual obligations which may exist between mortgager and mortgagee.

## IV. CONCLUSION

In conclusion, the state of North Carolina may have an interest in recognizing extra-contractual fiduciary protections for its consumers when they are confronted with the complexities of mortgage contracts in cases such as this. While the mismanagement of an escrow account associated with a single mortgage may not have far reaching consequences for an institutional lender, the effects of such mismanagement can be devastating to a mortgagor. Viewing the facts in the light most favorable to the Plaintiff, the Court finds that Plaintiff has plead sufficient facts to support claims of breach of fiduciary duty. Ultimately it is the duty of the jury, not the Court, to make findings as to whether or not an extra-contractual fiduciary duty exists under these facts. Powell, 110

N.C.App. at 347.  Defendant's Motion to Dismiss Count Three will be <u>denied</u>.


**IT IS THEREFORE ORDERED** that Defendant's "Motion to Dismiss" Count III, Plaintiffs' claim of Breach of Fiduciary Duty is **DENIED**.


Signed: September 5, 2007

Richard L. Voorhees
United States District Judge